Third Generation, Inc. (hereinafter referred to as "TGI"), appeals the trial court's order granting Stephen M. Wilson's motion for a new trial and seeks the reinstatement of a jury verdict.
Benjamin F. Harbin III and his sister, Norma Harbin Louvorn, hired Stephen M. Wilson, a Huntsville attorney, to incorporate their toy business.[1] Wilson prepared the articles of incorporation and, subsequently, Harbin and Louvorn formed TGI, initially owning 100% of the stock. Shortly after the incorporation, TGI issued to Wilson 100 shares of stock in exchange for legal services rendered to the corporation. Harbin served as the president of TGI and Wilson served as vice president.
In order to raise capital for TGI, Harbin and Louvorn sold their shares of stock in TGI to various individuals. Additionally, TGI secured personal loans from Harbin, Wilson, Dr. Robert A. Sammons, Dr. F. Calame Sammons, and Daniel B. Poole, among others.
In 1990, TGI decided to market and sell a product called "Fluppets." Fluppets are a kind of hand puppet made by a company in England named Furrytails, Ltd. Harbin and Wilson met Malcolm Briddon, a citizen of England, who was associated as a salesman with Furrytails, and negotiated with him to become the exclusive distributor of Fluppets in the United States. Subsequently, TGI entered into an exclusive distribution agreement with Furrytails to market the Fluppets.
SouthTrust Bank lent TGI $75,000 for the initial purchase of 15,000 Fluppets from Furrytails; both Harbin and Wilson personally guaranteed the loan. When the Fluppets were delivered, a majority of them were defective and, consequently, were returned to Furrytails. Because of the return of the defective Fluppets, Furrytails credited TGI's account.
In late 1990, Harbin and Wilson offered Briddon and Brian Thompson, also an English citizen and Briddon's accountant, the opportunity to join TGI in its efforts to distribute the Fluppets on the American market. However, because of TGI's outstanding debts, Briddon and Thompson were hesitant to become financially involved in TGI. Therefore, Harbin, Wilson, Briddon, and Thompson agreed to form a separate corporation, Twickenham Trading Company, Inc. (hereinafter "Twickenham"), for the purpose of distributing Fluppets within the United States.
Wilson prepared the articles of incorporation for Twickenham; they were signed on January 1, 1991, and were filed with the probate court on January 28, 1991. TGI owned 75% of Twickenham's stock, and Design Trading, an English corporation owned by Briddon and Thompson, owned the remaining 25% of the stock. TGI contributed to Twickenham cash, inventory, customer accounts, accounts receivable, hard assets, the credit from Furrytails, and the benefits of its distribution rights under the exclusive distribution agreement with Furrytails.
The articles of incorporation reflect that the initial board of directors/officers of Twickenham were Harbin, president; Briddon, vice president; Wilson, secretary; and Thompson, treasurer. Harbin and Wilson represented TGI's interest on the board, while Briddon and Thompson represented Design Trading's interest on the board. Additionally, the articles reflect that 750 shares of stock were issued to TGI and that 250 shares were issued to Design Trading.
On February 27, 1991, Wilson called an informal meeting with Briddon, Robert Sammons, Poole, and John Cates, Wilson's attorney; in that meeting they agreed that Harbin's position as president of Twickenham would be terminated. Wilson stated that the termination of Harbin was prompted by reports of financial irregularities in the corporation that Wilson had personally received from Mike Worley, Twickenham's sales manager. *Page 520 
Wilson stated that he began an investigation into the financial dealings of Harbin with TGI and Twickenham and discovered that a significant amount of money was coming into the business that did not appear on the books of either TGI or Twickenham.
Wilson called a board of directors meeting on February 28, 1991, and at that meeting the board voted to remove Harbin as president and to issue an additional 1,000 shares of stock in Twickenham to Robert Sammons for $25,000. The sale of stock caused TGI's interest in Twickenham to be reduced from 75% to 37.5% and caused Design Trading's interest to be reduced from 25% to 12.5%.
A few months after Harbin was removed as president, Twickenham ceased operations and a new company, London Trading Company, was formed. Most of the assets of Twickenham were transferred to London Trading, including the right to distribute Fluppets. Approximately one-fourth of the London Trading stock was issued to Wilson, personally, and one-fourth was issued to Briddon. Wilson and Briddon were also officers and directors of London Trading.
On May 23, 1991, Robert Sammons, Calame Sammons, Poole, and Wilson sued TGI and Harbin for money lent to, and not repaid by, TGI and Harbin. Robert Sammons sought to recover $50,000 for money lent to TGI; Calame Sammons sought to recover $10,000 for money lent to TGI; Poole sought to recover $6,000 for money lent to TGI; and Wilson sought to recover $119,000 for money lent to TGI and sought to recover $19,500 for money lent to Harbin. Additionally, Wilson sought a judgment declaring that a promissory note, creating a purchase money security interest ("PMSI") in the Fluppets, was valid and in full force and effect, and that Wilson was entitled to the possession of the Fluppets.
On October 21, 1991, TGI and Harbin answered and counterclaimed against Wilson. TGI asserted various counterclaims against Wilson, contending that Wilson had altered Twickenham's articles of incorporation after the articles had been signed by TGI, as one of Twickenham's incorporators. These counterclaims included claims alleging fraud; breach of Wilson's fiduciary duty to TGI arising out of his status as an officer of TGI; breach of Wilson's fiduciary duty to TGI arising out of his status as a director of TGI; and breach of Wilson's fiduciary duty to TGI, as a shareholder of Twickenham, arising out of his status as an officer and director of Twickenham. Further, TGI asserted against Wilson claims alleging conspiracy, conversion, and intentional interference with contractual relations. TGI also filed a third-party complaint against Briddon alleging that Briddon, as an officer and director of Twickenham, had breached his fiduciary duty to TGI.
On February 3, 1991, TGI amended its counterclaim and third-party complaint, to seek damages against London Trading for intentional interference with contractual relations between TGI and Furrytails and seeking damages from London Trading, Twickenham, and Wilson for conversion.
Before trial, the court entered a summary judgment in favor of Poole and Calame Sammons against TGI. Before the trial began, Robert Sammons, and Harbin and TGI reached a settlement. London Trading and Twickenham never appeared in this action, and the claims against them were not submitted to the jury during the trial of this case.
Wilson moved for a directed verdict on all claims at the conclusion of Harbin and TGI's evidence and at the conclusion of all the evidence. The motion was granted as to all claims, except (1) TGI's claim alleging fraudulent suppression of material facts by Wilson; (2) the claim against Wilson alleging breach of fiduciary duties as an officer of TGI; and (3) Wilson's original claims seeking a recovery of $19,500 for money lent to TGI and seeking a judgment declaring that the promissory note in the amount of $75,000, containing a PMSI in the Fluppets, was in full force and that he was entitled to possession of the Fluppets. These claims were submitted to the jury.[2] *Page 521 
The jury returned a verdict against Wilson and in favor of TGI on the fraudulent suppression claim; it awarded $125,000 in punitive damages but awarded no compensatory damages. On TGI's claim against Wilson for breach of his fiduciary duty as an officer of TGI, the jury found in favor of TGI but awarded neither compensatory nor punitive damages. The jury also returned a verdict in favor of Wilson and against TGI and Harbin on Wilson's promissory note claim and awarded him $15,500 in damages and the Fluppets, which had been pledged to secure repayment of the note.[3]
The trial court on June 14, 1993, entered a judgment pursuant to the jury verdict. Wilson then moved for a new trial, arguing (1) that the jury's verdict on the fraudulent suppression claim was inconsistent; (2) that the jury's verdict on the breach of duty claim was inconsistent; and (3) that the damages awarded him on his promissory note claim were not adequate. The court subsequently entered an order setting aside the judgment and granted Wilson's motion for a new trial, without specifying which of these grounds it based its decision on. TGI appeals.[4]
From the outset, we recognize that "[w]hen the trial court grants a motion for new trial, without specifying the grounds therefor, the ruling must be sustained on appeal if any good ground is presented by the motion." State v. Blackburn,655 So.2d 948, 949 (Ala. 1994). However, if the trial court's order granting a new trial does not state a specific ground for granting a new trial and this Court determines that no ground, other than a "great weight and preponderance of the evidence" ground, supports the new trial motion, we must then conclude that the "great weight and preponderance of the evidence" ground was the basis for the order. Blackburn, 655 So.2d at 949. "Where the basis for granting a new trial is that the verdict is against the great weight and preponderance of the evidence, this Court will reverse the trial court's order if it is easily perceivable from the record that the jury verdict is supported by the evidence." Blackburn, 655 So.2d at 949. "In other words, if there is any evidence to support the jury's verdict, this Court must conclude that the verdict is not palpably wrong or manifestly unjust and must reverse the trial court's order granting the motion for a new trial." Blackburn, 655 So.2d at 949.
TGI argues that the trial court erred in granting Wilson's motion for a new trial, because, it contends, the absence of compensatory damages was not inconsistent with the jury's award of punitive damages for fraud.
In First Bank of Boaz v. Fielder, 590 So.2d 893 (Ala. 1991), this Court held that an essential element of a cause of action for fraud is injury to the plaintiff. That injury to the plaintiff may take the form of an injury or loss that would support an award of compensatory damages or may take the form of a noncompensable violation of a legally protected right that would support only an award of nominal damages in recognition of the tort. A jury may award punitive damages in a fraud action if the plaintiff makes a sufficient evidentiary showing that he has been injured as a result of the fraud and that the defendant's conduct warrants punishment. Fielder, supra.Fielder specifically held that an award of compensatory or nominal damages is not a prerequisite to an award of punitive damages. The appropriate inquiry is whether TGI presented sufficient evidence to support the jury's finding that it was injured, at least nominally, by Wilson's wrongful conduct and whether he should be punished for that conduct.
At trial, TGI alleged that during the weeks after the Twickenham articles were signed but before they were filed with the probate court, Wilson changed a critical provision in the articles, without disclosing the change to, nor first getting approval from, either TGI or Design Trading. The provision *Page 522 
TGI says was altered dealt with the corporation's ability to issue new stock, by setting out the number of shares of Twickenham stock the board of directors was authorized to issue. TGI produced an exhibit indicating how it says the articles read before Wilson filed them. That exhibit indicates that the stock structure was different from the stock structure reflected in the articles as filed by Wilson with the probate court. Specifically, it shows that only 1,000 shares of stock were authorized and issued.
Harbin testified that when he signed the Twickenham articles of incorporation on behalf of TGI, there were only 1,000 authorized shares of stock that could be issued. Additionally, he stated that he never told Wilson, or anyone else, that there would be 1,000 shares issued but 2,000 shares authorized. By deposition, Briddon testified he understood the articles to reflect that only 1,000 shares of stock would be authorized, and he stated that he had never discussed whether, or agreed that, 2,000 shares would be issued, until he was called to a meeting at the office of Wilson's attorney.
Wilson testified that after the articles were initially drawn up, with only 1,000 shares of stock authorized and issued, he realized that the articles he had drafted should have reflected that 1,000 shares were authorized and issued and that an additional 1,000 shares were authorized, but unissued. Wilson testified that the purpose of the additional unissued shares was to provide for growth ownership, without the necessity of having to amend the articles of incorporation. Wilson insisted that all interested parties were notified of this change and approved the change before he filed the articles.
As previously noted, the jury returned a verdict for TGI under the fraudulent suppression count, awarding zero compensatory damages and $125,000 in punitive damages. We hold that the evidence was sufficient to submit the fraudulent suppression count to the jury. The record indicates that the jury found TGI was injured as a result of Wilson's failure to disclose the change in the articles of incorporation before filing them in the probate office and that the jury found that Wilson's conduct warranted punitive damages.
However, Wilson points out that even if the $125,000 judgment is not inconsistent and is supported by the evidence, the trial court nevertheless correctly granted a new trial, because, he argues, TGI's fraudulent suppression claim was not properly brought under the Alabama Legal Service Liability Act ("LSLA"), Ala. Code 1975, § 6-5-570 et seq.; he argues that that claim must be brought under the LSLA because the claim arose from his role as an attorney for TGI. Even if this argument is meritorious, this is not a ground that would support the grant of a new trial; instead, it was a ground that related to Wilson's request for a judgment notwithstanding the verdict. The trial court refused to grant Wilson either a directed verdict or a judgment notwithstanding the jury's verdict, on any of these grounds; Wilson did not cross-appeal. Therefore, Wilson's argument is not properly before this Court.
Based on the foregoing, we conclude that the trial court erred in granting a new trial on the fraudulent suppression count. The verdict on that count is hereby reinstated.
We note that TGI has stipulated to a dismissal of that portion of its appeal relating to the granting of a new trial on the breach-of-fiduciary-duty count if the jury's verdict on the fraudulent suppression claim is reinstated. Therefore, we dismiss TGI's appeal from the granting of a new trial insofar as it relates to the count alleging a breach of fiduciary duty. Because Wilson will therefore receive a new trial on the breach of fiduciary duty claim, we pretermit discussion of his argument on this point.
Next, TGI contends that the trial court erred in granting Wilson's motion for a new trial on the promissory note claim, because, it argues, a mathematical certainty as to the precise manner in which the jury computed its award to Wilson on this claim is not necessary. Wilson contends that the trial court correctly granted his new trial motion, because, he says, the jury's verdict awarding him $15,500 based upon his promissory note claim is inconsistent and not supported by the evidence. *Page 523 
As previously noted, Wilson sought to recover $119,000 for money lent to TGI, $19,500 for money lent to Harbin, and a judgment declaring that he was entitled to the Fluppets. At trial, Wilson produced two promissory notes signed by TGI in the amounts of $6,000 and $75,000, which were secured by the Fluppet inventory, and another promissory note made by Harbin in the amount of $10,000. All three were made payable to Wilson.
However, Harbin testified that TGI's inventory at the time of the creation of Twickenham had an approximate value of $63,000. After the trial court's instructions to the jury that the Fluppet inventory secured the repayment of the $75,000 promissory note, the jury awarded the inventory to Wilson. Additionally, Harbin testified that he worked out a settlement with Wilson regarding the $10,000 promissory note. Specifically, Harbin stated that he agreed to put the $10,000 back into the corporation rather than pay Wilson directly and, in exchange, Wilson received an additional 200 shares of stock.
When there is no evidence to support a jury verdict, the trial court should grant a motion for a new trial on that ground. Fidelity Guar. Ins. Co. v. Sturdivant, 622 So.2d 1279
(Ala. 1993). Thus, the trial court correctly granted Wilson's motion for a new trial on the promissory note claim if the amount of the jury verdict cannot be justified by any reasonable hypothesis presented by the evidence. Sturdivant, supra. However, in Tuscaloosa Acoustical Systems, Inc. v.Moore, 572 So.2d 1267 (Ala. 1990), this Court explained that mathematical certainty is not necessary in order to uphold a jury verdict.
As previously noted, the jury returned a verdict in favor of Wilson and against TGI and Harbin and awarded Wilson $15,500 in damages and TGI's Fluppets inventory worth approximately $63,000. This verdict, totaling $78,500, was recovery for the promissory notes totaling $81,000. Although these amounts are not equal, this Court has established that we do not have trials by computers or appellant review by computers and jury verdicts need not equal to a mathematical certainty the greatest amount that the evidence would support. TuscaloosaAcoustical Systems, supra.
Considering the testimony of the parties and considering the exhibits, we find support for the jury's verdict in the evidence presented at trial. Accordingly, we hold that the trial court erred in granting Wilson's motion for a new trial on the promissory note claim.
The appeal is dismissed in part. The order granting a new trial on the fraudulent suppression claim and on the promissory note claim is reversed; the jury's verdict on those claims is reinstated; and the cause is remanded for the entry of a judgment on the verdict as it relates to those claims.
DISMISSED IN PART; REVERSED IN PART; AND REMANDED.
ALMON, SHORES, HOUSTON, and INGRAM, JJ., concur.
[1] The business owned two board games named "Secrets" and "Hang In."
[2] The claim against Briddon alleging breach of fiduciary duties as an officer and director of Twickenham was also submitted to the jury.
[3] Additionally, the jury found in favor of TGI and against Briddon on TGI's claim alleging breach of his fiduciary duties as an officer and director of Twickenham, awarding TGI $50,000 in compensatory damages and $125,000 in punitive damages.
[4] Harbin, Briddon, Robert Sammons, Calame Sammons, Poole, London Trading, and Twickenham are not parties to this appeal.